## ED WILCOX v. THE STATE.

### *No. 16.   Decided June 23.*

**Nonage — Death Penalty — Rape— Evidence.**—Article 35 of the Penal Code declares, "that a person, for an offense committed before he arrived at the age of 1 7 years, shall in no case be punished with death." See evidence reported which, .n the opinion of a majority of the court, failed to support a judgment of conviction for rape with the death penalty assessed, inasmuch as it fails to show that appellant was 17 years of age at the date of the commission of the crime. SIMKINS, J., dissenting, upon the ground that it is not sufficient that the testimony may suggest a doubt of appellant's being 17 years old, but the burden of proof was upon him to establish the fact.

APPEAL from the District Court of Guadalupe.   Tried below before Hon. GEORGE MCCORMICK.

This appeal is from a conviction for rape, with the punishment assessed at death.

Under instructions from Judge DAVIDSON, in his opinion, the evidence adduced at the trial is here given in full as shown by the statement of facts:

Mrs. S. Hereschop, for the State, testified:   My name is Sylvia Hereschop.   I am the woman referred to in the indictment.   I see the man that assaulted me in court.   He assaulted me in July, 1892, on the Dibrell place, four miles from the town of Seguin.   It occurred on Sunday evening, awhile after noon, as I was going from my house to my sister-

in-law's.   When I reached the gate that leads from the Dibrell farm into the pasture, the defendant was standing at the gate.   He came up to me and jerked my hat from my head and threw it away, and caught me by the arm and began pushing me backwards until I fell into some brush.   I got up, and he got me down again, and got on me with his pants open, pulled up my dress, and tried to have communication with me.   I hallooed and struggled and frustrated his attempt.   He then caught me by the throat and choked me so that I could not cry out.   He held his hands over my mouth, and said he would kill me.   He then rubbed his penis over my face and mouth, and ''messed'' over my stomach.   I struggled with him quite a while.   He then penetrated my privates with his penis. His penis would be in and out of my privates in the struggle, as I kept struggling and moving my body and legs, fearing the result of such a connection.   When he was through he let me up, and I went immediately back to my house as fast as I could, in a rapid trot; could not run fast on account of the struggle and excitement.   When his penis entered my privates he held it in his hand.   I struggled and kicked out with my legs to prevent his penetrating my person.   He did not have my consent.

I was travelling the road that leads from my house to my sister-in-law's when attacked and assaulted by the defendant.   The defendant scratched my throat and tore my dress in the struggle.   It occurred in the pasture, in the brush, about fifty yards from the field and pasture gate.   When I got away from the defendant and returned home, I told my husband, who was there alone, about what had happened to me, which was about ten minutes after I was released from the defendant.   My husband was the first person I saw after I was assaulted.   The defendant followed me a part of the way, I being in the road and he over in the corn field near the fence; he stopped following me just before he got to Mrs. Dibrell's place.   I was hallooing when the defendant caught me by the throat.   I could not see any one from the place where defendant assaulted me.   I can not speak or understand English, but I know what the word ''kill'' in English means, as I learned it from my children when killing animals on our place.   I live on the Dibrell place, about sixty steps or more from Mr. Flowers' place.   Did not know the defendant's name, but had seen him for three months over at Mr. Flowers', where he worked.   When I told my husband what had happened, he started to hunt the defendant. (Witness then exhibited a dress she had on at the time of the assault; it was torn and ripped on the bottom.)   I am the mother of six children.   It was shown that the woman was a French woman, of medium size, perhaps middle age, the counsel of the defendant requiring her to stand up and make provert of herself.

Cross-examined:  The place of assault was about 100 yards from the nearest house on Dibrell's place, a rent house; it was occupied.   I was

assaulted one-half mile from my own house. From the time the defendant assaulted me until he accomplished his purpose, was about four or five minutes, I think, but I was so excited that I can not tell the time. I hallooed before he tried to choke me. I was about a half mile from Mrs. Dibrell's when assaulted. My sister-in-law's name is Monicia Hereschop. My house is between the place of assault and Mrs. Dibrell's (widow). The defendant, while at Mr. Flowers', passed two or three times a day going to his work. I did not think the defendant was waiting for me at the gate. I don't know whether he was or not; had I known he was, I would have changed my course. I know the defendant. He never attempted such a thing with me before. He had never spoken to me before. I don't know how long after he put his penis in my mouth and face and emitted, that it was he penetrated my privates with it; perhaps a minute or two. I was too excited to remember time. I am in good health; don't know how much I weigh. (Witness here, at request of counsel for the defendant, stood up and made povert of herself.) I learned the meaning of the word "kill" from my children in talking about killing things on the place. Before I was assaulted I tried to halloo. He caught me by the throat and put his hands over my mouth. He then took his hand from my mouth and took hold of his penis. I did not see any one in the field near by. The dress exhibited was torn in my struggle with the defendant. (The dress showed that it was torn at the back of the waist.)

There was no rent house near the place of assault, about 100 yards distant. Defendant followed me near the widow Dibrell's house. Mrs. Dibrell and her children were there, I suppose. I did not call them, because I could not speak English, and I was going home as fast as I could. This house was near my road home. The corn crib of Lawrence Wilson is nearer the place of assault than Mrs. Dibrell's. I stated before the justice of the peace, on examining trial, that defendant rubbed his penis in my face and mouth. When I reached home after the assault I was crying, and I told my husband what had happened, and that I had nearly lost my life, and that he was lucky to find me in good health; and my husband went immediately to hunt the defendant. I did not know the name of defendant, but he was a servant at Mr. Flowers', and I had seen him frequently for the past three months. I first saw the defendant after the assault, under arrest, and in custody of Mr. A. W. Dibrell. This was about one hour or an hour and a half after I had been assaulted. I showed the place of assault to Mr. Frank Dibbrell this week, and pointed it out to my husband the week I was assaulted. Did not show the place to any one on the day of the assault. There were many marks made by my arms and heels. There may have been prints of two persons—my heels and his knees. When I showed the place to Mr. Dibbrell there were no marks left. It rained the same evening I was assaulted.

Defendant is strong compared to me. I showed the scratches on my neck to my husband and A. W. Dibbrell and Flowers the same evening of the assault. I had passed the gate about ten steps when the defendant caught me, and in trying to get me down he pushed me back from the gate about fifty steps. If defendant said anything to me, I did not understand it. Defendant had nothing in his hand when he assaulted me. Defendant penetrated my privates with his penis, after he had the emission in my face. (The witness spoke continually through an interpreter.)

Peter Flowers, for the State, testified: I know the defendant, and remember the occurrence of Mrs. Hereschop being assaulted. I live on —— Dibrell's place, and Mrs. S. Hereschop and husband live on —— Dibrell's place, adjoining, our houses being about sixty steps distant. Was at home the day the assault is said to have occurred. It was Sunday. Defendant had been working for me for about four months prior to day of assault. On the day of the assault the defendant left my house about 1 o'clock p. m., going in the direction of the pasture where the assault is said to have occurred. A while after defendant left my house I saw Mrs. Hereschop pass near my house, walking rapidly towards her house, and looking back every now and then over her shoulder. I was sitting inside of my house, and saw her through the window. In a few moments Mrs. Hereschop and her husband were at my house, both coming up rapidly and excited. Mrs. Hereschop was crying. Her dress was torn, had dirt on the back, and she had scratches on her neck. She made known to me what had happened. This was only a few minutes after Mrs. Hereschop had passed my house, crying, from towards the field and pasture gate and going in the direction of her home. The scratches upon her neck seemed to have been made by finger nails, judging from the size, shape, and distance they were apart. (Witness was here shown the dress exhibited by Mrs. Hereschop while upon the witness stand, and identified it as the same dress she had on the day of the assault when she came to his house.) Mrs. Hereschop knew the defendant by sight, as he had to pass by her place going to and from his work for the past three or four months. It was more than an hour after defendant left my house before I saw Mrs. Hereschop coming rapidly from the direction I had seen defendant going. Mrs. Hereschop does not speak English. I speak French, and am the only one in that immediate neighborhood who does.

Here the witness made a diagram of the farms, pasture, and location of houses, giving the distance from the several points. He said from Mrs. Hereschop's to her sister-in-law's is something over a mile, and from Hereschop's house to gate leading from farm into the pasture, is half a mile. Richard Duke, a bachelor, lives in a house on the widow Dibrell's place, alone; it is about 100 yards from the pasture gate, and is the nearest house to the gate. The widow Dibrell's house is about half a mile from the gate, and the Mauer house is several hundred yards from the

gate.    The pasture in which the assault is said to have occurred is very brushy, and the roads going through the farms and pasture are only used as leading from the different places on the old Dibrell farm, which has been divided into three farms among the heirs, one belonging to widow James Dibrell, one to William Dibrell, and one to —— Dibrell, and separated by fences; and the road leading from Mrs. Hereschop's house to pasture runs down by fence, as indicated by dots, and the one from my house to pasture runs down same line of fence on opposite side, which is also indicated by dots.    I saw the defendant under arrest about an hour and a half after I saw Mrs. Hereschop at my house, in the condition before described.    A. W. Dibrell, city marshal of Seguin, was over at his sister's, the widow Dibrell's, when Hereschop and wife came to my house, and Mrs. Hereschop went from my house to widow Dibrell's, and it was after this I saw A. W. Dibrell have the defendant under arrest.    Mr. Hereschop, the husband, talks some English, and can make himself understood.

Cross-examined:    Defendant is as strong as the common run of boys of his size and age.    Never knew of the defendant going over or being at Hereschop's house.    The well where my stock is watered is on my own place, and the Hereschop family do not use water from it; they have a well on their own place, in the yard.    Mrs. Hereschop did not speak to me the day she passed my house.    I was on the inside of my house, sitting down, and saw her through the window.    I saw Mr. Hereschop when he went over to widow Dibrell's, where the marshal was.    Mr. and Mrs. Hereschop both told me of the assault, and Mrs. Hereschop showed me her neck and clothing.    The road I saw her travelling is the only one between her place and her sister-in-law's place.    The defendant worked in my field, and Mrs. Hereschop and family worked in the field adjoining mine.    She is able to work; can not say that she is not a strong, healthy woman.    Mrs. Hereschop offered to show me the place of assault, but it rained that evening, and I did not go to see it.    The diagram made by witness on direct examination for the State was put in evidence; that is, the diagram made by witness Flowers.

A. W. Dibrell, for the State, testified: I was on the Dibrell farm, visiting my sister-in-law, on the day the rape is said to have been committed, and heard of the assault said to have been committed on the French woman. Her husband informed me of it. I went to the place where the shooting match was, some 900 yards from where I was, and arrested the defendant. This was about 3:10 p. m. He was at the shooting match spoken of, and about a mile from the spot spoken of by the other witnesses. At first my attention was called to some man passing the house before I had heard of the assault. I then concluded he was the man. I got on his track inside of the pasture and followed it to the place of the shooting match, and there arrested the defendant. The track came from the direction of the gate mentioned. I then took the defendant straight to the witness Flowers' house, and the woman identified him as the man who assaulted her. I examined her, and she had marks as if made by fingers on her neck and throat, and her dress was torn and dusty. She was much excited, and crying, and wanted to attack the defendant.

Cross-examined: I did not see the defendant pass the house. I only heard a man had passed. The weather was very dry at the time; it rained that evening or night. The place where the assault is said to have been committed is in Guadalupe County, Texas.

Frank Dibrell, for the State, testified: That he was at the widow Dibrell's on the day of the alleged assault upon Mrs. Hereschop, and saw some person pass across the farm, coming from towards the pasture gate and going in direction of place of shooting match. He was walking very rapidly, and had a blue handkerchief in his hand, using it as he would a fan, fanning himself. I did not try to see who it was with A. W. Dibrell when he arrested defendant. He had in his possession a blue handkerchief during the past week. Mrs. Hereschop showed me the place she claimed was the place she was assaulted at. It was inside of pasture, and about forty steps from gate leading from field into pasture; it was very brushy inside of pasture, except at place of assault there is a clear space of about fifteen feet square. This place is in Guadalupe County. I only know it to be the place from what Mrs. Hereschop told me.

Mr. Hereschop, for the State, testified: I am the husband of Silvie Hereschop, the alleged assaulted woman, and was at home when my wife left Sunday evening and returned. (Here witness was asked by the district attorney what his wife said to him on her return home, to which defendant's counsel objected; and it being late in the evening, about time for court to adjourn, the court held the question in abeyance until morning, to examine a decision the district attorney had in point; and the next morning when the witness was called, the district attorney informed the court he would waive the question and not ask it, so the witness was not called.)

August Burger, for the State, testified: I was at the place of the shoot-

ing match when A. W. Dibrell came and arrested defendant, and I tied the defendant for him. The defendant had in his possession a blue handkerchief. He was at the place when I got there. I had been there fifteen or thirty minutes when Dibrell came.

Ed Coleman, for the State, testified: I know the defendant and know Mrs. Hereschop. Don't know who Mrs. Hereschop associates with.

Richard Duke, for the State, testified: I live on the widow Dibrell's place; know the defendant and Mrs. Hereschop; don't know who she associates with.

Cross-examined: I live in a rent-house by myself, a short distance from the gate leading from the farm to pasture. I was not at my home on the day of the alleged assault, and I know nothing about it.

Professor Priestly, for defendant, testified: I know the defendant; have known him about two years. He went to school to me about two sessions. I could never get him to study and understand much about books. He did not seem to have a sound mind. He quit school to go to work. He did not seem to know what he was doing, or what to do when called upon to recite. He seemed to have no capacity to learn, and had peculiar ways.

Cross-examined: Defendant seemed to know right from wrong, but not so all the time. By his peculiar ways, I mean to say he would get up and go out without my permission, and when reciting would often ask some of the other children what I was talking about. I thrashed him for his conduct at school, as I did other children who disobeyed my rules, but it did no good. I have not seen other scholars act in school like defendant. I did not discharge him from school for unsoundness of mind, but told Murphy, who sent him to me, that he could not or would not learn anything. I do not know how old he is.

The defendant, Ed Wilcox, testified: I know Mrs. Hereschop; have known her four months. The first time I had anything to do with her, I met her at the well; she was drawing water, and I asked her for a drink; she then gave me the water, and commenced playing and pinching at me. She unbuttoned the top waistband button of my pants. I then left her. That night I went across to her house and " done " to her what I wanted to and left. The next time, when she was in the pasture next to us, I had connection with her five times. The last time was in the cotton patch; where I told her to stop was not on the way to where her sister-in-law lives. While we were there I saw a man coming. I made signs to her that some one was coming. We then crawled along to the fence and under the barbed wire, and the wire caught her dress and tore it. I then went on to the shooting match, where I was arrested. This was the day it is said the rape was committed. The way the thing first began, was by her picking at me; she unbuttoned the top button of my pants. When I went to the shooting match, I went by Mrs. Dibrell's house. I had been

at the shooting match about one-half hour before I was arrested.   There was an understanding between she and me that she was to meet me in the cotton patch that morning.   My arm was once broken and the small of my back hurt.   I am not strong now in that arm; can not carry a bucket of water very far with that hand.

Cross-examined:   She spoke no English the day I met her at the well. I did not let any one know that I was going to her house that night.   I went there about dark.   The three boys were with their father; the largest girl was at her aunt's.   I knew she was at home by herself.   I stayed long enough to do what I wanted to do.   I did not tell Mr. Anthony Dibrell that I would not rape a woman like her, because I could "do it" to other women, and that I could do it to Flowers' wife.   I met the prosecutrix in her own cotton patch that day they say I raped her.   I had talked to her the Saturday night before, behind their cow pen.   I made "signs" to her Sunday morning to be in the cotton patch after dinner. When I got there she was already there.   I was not at the gate at all.   I was not standing at the gate when she passed.   It was a white man I saw pass where we were together in the cotton patch.   I raised up to look, and saw the man; he was coming right across the field, about 100 yards from us.   The man had on blue pants.   He was not Mr. Flowers.   I don't know if it was the woman's husband.   He did not see me; I ran to get out of the way.   The man was coming across the cotton rows.   Don't know how the scratches got on the woman's throat; I did not put my hand about her throat.   I went to the shooting match because I saw Ben Flowers going; I followed him there.   I did not speak to him; I sat down where he did.   I walked fast.   I live in the house with him.   Flowers had hired me to work for him.

Professor D. V. Ridley, for defendant:   I have known defendant for about ten years.   He was about 6 or 7 years old when I first knew him. He never went to school to me.   I know nothing about his mental capacity, and can not be positive about his age.

Belle Wilcox, for defendant:   I am the mother of the defendant.   He was 16 years old on the 14th of this month (November).   He was born in the year 1877.

Cross-examined:   I am just as positive that he is 16 years old as I am that he is my child, and I am just as positive that he was born in the year 1877 as I am that he is my child.   I did not record his birth in anything, and have no data by which I say that he is 16 years old and was born in 1877.   I gave him away to Dan Murphy when he was 6 years old.   I don't know what year I was born in, and don't know what county I was married in, but think it was in Bexar County, on the Cibolo, on Mr. Ware's place.   I was married in 1876.   Am not living with my husband now; don't know when he left or where he is.   Defendant was born after my marriage and not before.   I did not tell Sheriff G. M. Autrey

that the defendant was 16 years old on the 27th day of last April. Witness also said that she was 31 years old at the present time, and that she had not married since her first marriage.

George Wilcox, for defendant, testified: I am no relation to the defendant. Have known him ever since he was born. I think he is about 16 years old. He is not much stout; he had his arm broken by a mule kicking him about five or six years ago. Belle Wilcox's husband was my nephew. Belle Wilcox had three children when defendant was given to Dan Murphy. The defendant is what we call a "woods colt;" that is, he was begotten before his mother married. I do not know who his father was. I think his mother was married to my nephew —— Wilcox in 1876, and I think the defendant was a "living child" at the time of the marriage. The defendant was born on the Cibolo, about 1877. He was about 6 years old when turned over to Murphy. I might miss defendant's age a year or two. I moved to Ware's place in 1873. I was there about four years before defendant was born. Don't think he can be as much as 16 years old. I talked with his mother yesterday; did not talk about his age. I think the oldest of her other children is 12 years of age.

John Sheffield, Jr., for defendant, testified: Know the defendant, and have known him for nine or ten years. I have lived near him. Don't know whether he is a strong man or not. He was 6 or 7 years old when I first knew him. Never saw any test of his strength. He had his arm broken several years ago. He was living with Dan Murphy when I first knew him; don't know how long he had lived with Dan Murphy that time.

G. M. Autrey, for the State, testified: I am sheriff of Guadalupe County. I attached the witness Belle Wilcox as a witness in this case, and brought her from San Antonio to this court, and on the way here she told me that the defendant was born on the 27th day of April, 1877. I am positive of this. When the defendant was put in jail he told me he did not know the woman Mrs. Hereschop.

A. W. Dibrell, recalled by the State, testified: When I arrested the defendant, I warned him that anything he said to me could be used as evidence against him, and not for him. He asked me what I arrested him for. I told him for raping Mrs. Hereschop. He said, "My God;" denied it, and said that he would not do anything to that dirty old French woman; that he could get all he wanted from nice white women; and that he could have got it from Mrs. Flowers. He said he was down in the pasture about that time, and went from there to the place of shooting match.

August Ebert, for the State: I know the witness Mrs. Silvie Hereschop. She lived with her family on my place for two and one-half years. Her reputation for chastity and virtue is good.

Cross-examined: I never heard her reputation for virtue questioned. I never saw or heard of anything about her. She is a hard working woman.

Sam Neil, for the State: I have known the witness Mrs. Hereschop for six years. Her general reputation for chastity and virtue is good.

Cross-examined: I never inquired about her reputation and never heard it questioned. The reason I say her reputation for virtue and chastity is good, is from the fact that several of the French girls that come here were wild and reckless, and I have heard the neighbors refer to this fact, and in same connection to Mrs. Hereschop and her connection as being chaste and virtuous.

T. F. Wagner, for the State, testified same as Neil and Ebert as to good character and acquaintance.

Ed Wilcox, recalled for defense: The reason I told Mr. Autrey that I did not know Mrs. Hereschop was, that I was scared nearly to death at the time. The sheriff and others had told me that the people were going to hang me; and when he came with others to me, I thought they were going to mob me, and really I don't know what I told him.

Bell Wilcox, recalled for defense: I married Harry Wilcox in 1876. The defendant was born by my said marriage. I turned him over to Murphy in 1883.

Dan Murphy, for defendant: I have known the defendant, Ed Wilcox, for nine years. I partly raised him. He is no kin to me. He looked to be 5 or 6 years of age when I first knew him, about nine years ago, which would make him about 15 years of age. He was given to my wife by his mother. I sent him to school. Don't think he is of sound mind, judging from his talk and actions. His arm has been broken.

Cross-examined: I knew his mother before she gave the boy to my wife. I know the man that his mother was married to. I don't know the father of the boy. His mother had no husband when he was born. His mother was living in San Antonio when he was given to my wife. She told me the boy was born on the Cibolo. I think I got him about the first of 1883. He left me twice; the first time he was gone a day and a night. I was married in 1880. I did not know the boy then. He was in San Antonio when I first saw him. I had been married about three years when the boy was turned over to me. I was married in this county.

*Willliam M. Rust*, for appellant.—1. The Ake case being the only case in our Reports identical with this, we call the especial attention of the court to that case. 6 Texas Cr. App., 398. In that case, the only evidence as to defendant's age was one witness, who testified, that '' He could not identify defendant as Taylor Ake, but if he was, he was born in the fall of 1861, witness thought, though not certain.'' We desire to adopt the very able argument of defendant's counsel on the rehearing in that case for the appellant in this, with the additional argument, that in

our humble judgment the nonage in this case is not such a defense (if it is a defense at all) as is required to be proved beyond a reasonable doubt by the defendant. We are aware of the fact that alibi, self-defense, insanity, etc., where the defense goes to the very foundation of the prosecution and lets the defendant go scot-free, the burden of proof is on the defendant. But we do not think it so in a case like this, where he may be given a life sentence in the penitentiary, which is death's equivalent, and therefore is no defense at all. In our judgment, article 35, Code of Criminal Procedure, was not enacted to furnish a defense to the criminal, but as an independent, imperative statute, commanding that the State's escutcheon should not be stained by the shedding of the blood of even a criminal, who, when the crime was committed, was not doli capax, or 17 years old. And whether the youth of the accused is brought to the attention of the trial court of its own motion, by counsel, or amicus curiæ, it ought to be made to appear beyond a reasonable doubt that defendant was at the time of the commission of the offense at least 17 years of age.

In the Ake case the court say: "The presiding judge submitted the question most fairly and strongly in his able charge to the jury; he says: 'But no person can be punished with death for an offense committed before he was 17 years of age; so that in case you should find the defendant guilty as charged, you must not by your verdict require the infliction of the death penalty, if you have a reasonable doubt as to whether he was at the time of the alleged offense of the age of 17 years.'" And we take it, that must have been a correct charge, since the court approved it, and nowhere says it was too favorable to the accused. Whether the burden was on the State or defendant, the court should have given it in this case; and failing to do so, should have granted a new trial. But if the burden were on the defendant, then we say that the proof that defendant was not 17 is ample and wholly uncontradicted.

2. The testimony of the prosecutrix is contradictory, inconsistent, unreasonable, and improbable.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant having been convicted of rape, was given the death penalty, from which he prosecutes this appeal.

Under the evidence adduced, it is contended, that the defendant is under 17 years of age, and hence not subject to capital punishment. The offense was committed in July, 1892. Unless he was born prior to July, 1875, he could not be 17 years old at the date of the offense. In regard to this issue, his mother testified, that she was, at the date of the trial, 31 years of age; that defendant was born on November 10, 1877; that he was 16 at the date of his trial; that she was married on the Ware place, and she thinks this occurred in 1876; that defendant was born subsequent

to her marriage; that she gave defendant to Dan Murphy in 1883, when he was 6 years old.

George Wilcox stated, he had known defendant since his birth; that he was born on the Ware place; that he thought the defendant was about 16 years old; that he was of illegitimate origin; that he thought he "was a living child at the time of his mother's marriage. * * * I think defendant was born about 1877; was about 6 years old when turned over to Murphy. I might miss his age a year or two. I moved to the Ware place in 1873. Was there about four years before defendant was born. Don't think he can be as much as 16 years old."

Defendant was born on Ware's place. Sheffield said he had known defendant "nine or ten years. Have lived near him, and was living with Dan Murphy when I first knew him. Don't know how long he lived with Murphy at that time."

Dan Murphy testified, that he had "known defendant for nine years, and partially raised him. He looked to be five or six years old when I first knew him, about nine years ago, which would make him about 15 years old. He was given to my wife by his mother." The gift occurred during the year 1883. In rebuttal, the State proved that the mother told the sheriff that defendant was born about April 27, 1877. This is the evidence in the record in regard to the age of defendant. Otherwise than the statement of the mother to the sheriff, it is uncontradicted. Murphy said he was born at the time of his mother's marriage. He also testified that he had known him for only nine years, and he was then five or six years old. His means of knowledge that he was illegitimate is not disclosed by him. There is an unexplained interregnum of five or six years in regard to this witness' testimony. George Wilcox only thought he "was a living child at the time of the marriage," and yet thought defendant was born about 1877. The circumstances detailed by him exclude the idea that his birth could have occurred anterior to 1877. As presented to us, there is no testimony showing that he was born as early as 1875. His mother, at date of trial, November, 1892, was only 31 years of age. This fact stands uncontradicted. If this be true, she was only 15 when defendant was born. From this unusual occurrence the presumption is very strong that appellant was not 17 years of age when he committed the crime, if in fact he is guilty, especially when the State does not undertake to contradict the mother on this point, or endeavor to show that the mother was very young when defendant was born. The evidence, as furnished by the record, shows that defendant was under 17 years of age at the time of the commission of the crime charged against him. The Reporter will report the evidence.

The judgment is reversed, and the cause remanded.

*Reversed and remanded.*

HURT, P. J., concurs.

SIMKINS, JUDGE, dissenting.—I am unable to concur in the decision of this case. It is a case of rape by a negro upon a white woman, the sentence of the jury being death. The only ground upon which the reversal is placed is the insufficiency of the evidence to show that appellant was over 17 years of age. I take it to be the law, that where the guilt of the appellant is shown by the State, the burden of proving his age to be under 17 years rests upon him. Penal Code, art. 35; Ake's case, 6 Texas Cr. App., 398; Jones' case, 13 Texas Cr. App., 1.

The offense is shown to have been committed in July, 1892, and, to be under 17 at that time, appellant had to show, by a preponderance of testimony, that he was born since July, 1875. The only direct testimony as to age is that given as follows: Belle Wilcox, the mother, says he was born November 14, 1877, and was 16 years old November 14, 1892; that she has no data to prove it by; does not know when she was born; that she was married in 1876; and that defendant was born after she was married, and of said marriage. The sheriff, Autrey, states this witness told him defendant was born on the 27th of April, which witness denied stating. George Wilcox says, that defendant is 16 years old, and was born in 1877; that Belle Wilcox married his nephew in 1876, and defendant was a living child at his mother's marriage, and his father unknown; that he was "a woods colt;" that he might miss defendant's age a year or two. Dan Murphy says he partly raised defendant. He got him from his mother when he looked to be 5 or 6 years old, and has had him nine years. He knew Belle Wilcox before he got possession of defendant, and she had no husband when defendant was born, and his father was unknown. John Sheffield says he knew defendant nine or ten years ago, and he was 6 or 7 years old when he first knew him. An examination of this testimony shows, that while his mother and George Wilcox swear to his birth in 1877, it is so utterly contradicted by their other testimony as to be unworthy of credit. If he was 16 in November, 1892, he could not have been born in 1877. Again, both George Wilcox and Belle Wilcox swear to her marriage in 1876, and both George Wilcox and Dan Murphy swear to defendant being a living child at his mother's marriage. The only proof of defendant being under 17 being the contradictory statements of his immediate family, which seem to show that appellant was a living child at his mother's marriage in 1876, and no testimony whatever as to his age then, the jury did not believe the defense; and I do not think the character of the testimony is calculated to inspire any confidence in its truth. It is not sufficient that the testimony may suggest a doubt of appellant being 17 years old, but it is to be proven by him. I think the judgment ought to be affirmed.